Filed 4/22/15  P. v. Washington CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B254933 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA061145) |
| v. | |
| KENNETH LEROY WASHINGTON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kathleen Blanchard, Judge.  Affirmed with directions.

Emily H. Lowther, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Jessica C. Owen, Deputy Attorneys General, for Plaintiff and Respondent.

# I.  INTRODUCTION

A jury convicted defendant, Kenneth Leroy Washington, of burglary (Pen. Code,[1] § 459), theft of services valued in excess of $950 (§ 498, subd. (b)), and forgery (§ 470, subd. (d)).  The trial court found defendant had sustained a prior felony conviction within the meaning of sections 667, subdivision (d) and 1170.12, subdivision (b).  Defendant was sentenced to four years in state prison.  We affirm with directions to amend the abstract of judgment.

# II.  THE EVIDENCE

## A.  The Prosecution's Case

On September 26, 2013, Castlestone Properties acquired a single-family residence in the city of Little Rock, County of Los Angeles.  Castlestone Properties agents discovered defendant and his wife, Sherry Washington, were residing on the property.  Also residing in the residence was Donald Berdon.  Defendant claimed to have a lease for the property, but he never provided a copy to any Castlestone Properties employees.  A Castlestone Properties employee, Lauren Karnstedt, contacted the pertinent utility companies.  Ms. Karnstedt learned there had been no utility service to the property for several years.

On October 21, 2013, Detective James Moser went to the property to investigate.  None of the three occupants had a key to the house.  Defendant spoke to Detective Moser.  Defendant said he was leasing space in the house from the owner for $800 per month.  Defendant identified the owner as Chris Brown.  But defendant did not have any receipts for rent paid.  Moreover, defendant had not seen or spoken with the purported

---

[1] Further statutory references are to the Penal Code except where otherwise noted.

property owner, Mr. Brown, for several months. And defendant had no contact information for Mr. Brown. As a result, defendant said, he had ceased paying rent.

Defendant showed Detective Moser a document entitled "Residential Lease." The lease named defendant as the tenant. Named as the lessor was defendant's wife, Ms. Washington. The stated monthly rent was $500, not $800. Defendant and his wife had both signed the agreement as lessors rather than lessees. And the contract named Cameron Pann and Wana Collum as the lessor's agents. Defendant was unable to explain who they were or why their names were listed on the lease as the lessor's agents. Defendant had no contact information for either Mr. Pann or Ms. Collum.

Detective Moser arrested defendant. When questioned, defendant admitted the rental agreement was not "real," that it was "fictitious." Detective Moser also arrested defendant's wife. When defendant saw Ms. Washington had been arrested, he offered to tell the truth in return for her release. Detective Moser testified, "[Defendant] said if I let his wife go, that he would be honest with me."

Detective Moser entered the home and found it was fully furnished; it appeared people had been living there for some time. Moreover, all three utility services were in use. Detective Moser saw extension cords running through a bedroom window, down the baseboard and into electronic devices. Detective Moser investigated the utility connections outside the home. The water connection from the street to the house had been rigged. As a result, the water meter was not engaged. With the illegal service connection in place, there was no way for the utility to detect if water was being used. Nor was it possible to measure the amount of water use. The gas meter had also been tampered with. The locking mechanism had been pried open. And the electric meter had been altered so that the usage data was not being transmitted to the power company. Electrical service to the property had been cut off as of October 27, 2011. On March 5, 2012, Southern California Edison employees had installed a new meter at the unoccupied property. At that time, the meter read 0000. On October 21, 2013, the meter showed 3,183 kilowatts of electricity had been used.

3

Pradeep Kumar was a revenue protection investigator for Southern California Edison. Mr. Kumar calculated the value of the illegally acquired electricity based on the size of the house and the average household usage in the neighborhood. Mr. Kumar estimated the electricity had been illegally in use commencing June 21, 2012, four days after defendant admittedly began residing in the home. Mr. Kumar also estimated the illegal electrical use ceased on October 21, 2013, when defendant was arrested. Electricity was charged at 31 cents per kilowatt from May 31 through October 31 of each year. Electricity was charged at 29 cents per kilowatt from November 1 through May 30 of each year. At 31 cents per kilowatt, the value of the stolen electricity was $976.76.

## B. The Defense Case

Defendant testified in his own defense. Defendant testified to meeting the lessor, Mr. Brown, at the Lancaster courthouse. They spoke. Defendant said he was looking for a place to live. Mr. Brown said, "Well, I got a big 'ole house . . . ." The house was around the corner from where defendant resided. Defendant visited Mr. Brown's house and decided to move in. Defendant moved in on June 17, 2013.

There were several other people living in the home when defendant and Ms. Washington took up residence. Mr. Brown was living in the house with his fiancée, identified only as "Dotty." Defendant testified: "[T]he old man that died was [Dotty's] grandfather or something. And she had told me that she was practically raised there, so I just assumed that she lived there . . . for many years . . . ." Two others were also in residence, according to defendant, and they were identified only as "Doc" and "Rere." The persons identified only as Dotty, Doc and Rere all left some time after defendant moved in.

Defendant and Mr. Brown entered into a verbal agreement. Defendant would help take care of the property. Together, defendant and Mr. Brown made some improvements to the house. They replaced a bathroom sink and repaired a toilet and a leaking bathtub. They also worked in the yard clearing tumbleweeds and chopping up a felled tree.

4

Defendant admitted using the water, gas and electricity in the house. Defendant denied tampering with or diverting any utilities. He denied instructing others to do so. Defendant denied any knowledge the utilities had been diverted. Under the rental agreement, the utilities were included in defendant's rent. The lease specifically stated the landlord was to pay for "gas, water, light, trash." Defendant believed Mr. Brown, the alleged lessor, was paying for the utilities. Defendant further testified there were no interruptions in the utility services while he lived in the home. Defendant identified Mr. Berdon—who occupied the master bedroom—as the property's caretaker.

Defendant testified he had keys to the home. Mr. Brown had given defendant a key to the house. Defendant testified concerning the interview by Detective Moser. Defendant denied stating he had no keys during that conversation. Further, defendant denied stating the lease was inauthentic. Defendant did not receive mail at the house, but his dogs were registered to the address. Mr. Brown gave defendant a completed lease. All the information was filled out. Defendant did not read the lease. Defendant and his wife, Ms. Washington, signed the lease. Defendant admitted he never showed the lease to any Castlestone Properties representative. Defendant had been unable to locate the lease. The lease was packed away, and then he found it, but then he misplaced it. Defendant also testified he went to a courthouse, determined there were no eviction proceedings pending, and hence felt it unnecessary to produce the lease.

As noted above, the rental amount stated in the lease was $500 a month. The lease also provided, under the heading "Security Deposits," that, "On signing this Agreement, Tenant will pay to Landlord the sum of $1,750$900.00 as a security deposit." [*Sic*] Defendant's testimony with respect to his rent was unclear. Defendant testified his initial rent was $400 a month. At another point, he said it was $400 a month plus a $400 security deposit or "first and last," which therefore totaled $800." There was also a $100 charge "for the keys" and other matters.

Defendant testified that on June 17, 2013, he moved into the residence. On that date or within two days thereafter, Mr. Brown received $850 in rent. Mr. Brown gave

defendant a receipt for the $850. According to defendant, Ms. Washington had at some point handed that rental receipt to Detective Moser.

After defendant moved in, Mr. Brown and the person identified as Dotty went out of town. Mr. Brown returned alone a few days later. After Mr. Brown's return, defendant requested an extra room for storage. Mr. Brown agreed but increased the rent to $850 a month plus labor on his truck. Defendant, who was an auto mechanic, replaced the transmission in Mr. Brown's truck in lieu of first and last month's rent. Defendant also testified he did the automotive work in return for the extra room, and that the $850 was a security deposit for the second room. Defendant said the transmission repair was worth $850. At another point, defendant testified the rent was $400 a month for each of the two rooms for a total of $800. A reference to $900 in the lease included the value of defendant's labor on Mr. Brown's truck in connection with renting the second room. Defendant testified: "I gave [Mr. Brown] services to his vehicle. I gave him $850 for the first room and the $900 was for the security deposit and the first and last month rent on . . . the other room." So, according to defendant, the $1,750 figure on the lease was the total amount due. The statement in the lease that, "The tenant will pay landlord a monthly rate of $500," included a $100 deposit for the keys.

Mr. Brown took the lease agreement back from defendant at some point and made changes to the amounts involved. Defendant never paid Mr. Brown any additional rent—in July, August, September or October 2013. This was because in late July, Mr. Brown went out of town again and never returned. Defendant had no communication with Mr. Brown by telephone or in person after that time. Defendant attempted to telephone Mr. Brown but the number was disconnected. Defendant admitted he had twice been convicted, in 1991 and in 1996, of deadly weapon assault, a felony.

C. The Prosecution's Rebuttal Case

Fernando Romo testified as a rebuttal witness for the prosecution. Mr. Romo was a building supervisor for the Department of Public Works, Los Angeles County

6

Waterworks Division.  As noted, defendant testified there had been no interruption in the utility service while defendant resided in the home.  Mr. Romo testified that in fact water service to the property had ceased on October 31, 2011.  The meter reading on that date was 2,865.  On July 2, 2013, the meter reading was unchanged.  As of September 3, 2013, however, the meter had advanced to 2,875.  In other words, there had been water usage between July 2 and September 3, 2013.  No one ever contacted the public works department to restore water service.

Because there was no active account for the property, an investigation was instigated.  On September 5, 2013, a technician turned the water service to the property off and installed a locking device.  A September 23, 2013 follow-up visit occurred.  The lock had been cut and the illegal water service had resumed.  The meter read 2,880, corresponding to the use of 3,500 gallons of water.  The cost of the water used between July 2 and September 23, 2013, was about $17.  Damage fees were also incurred.  Castlestone Properties paid $87.63 to reinstall the water meter.

## III.  DISCUSSION

### A.  Sufficiency Evidence

#### 1. Standard of review

Defendant challenges the sufficiency of the evidence supporting his burglary, theft and forgery convictions.  Defendant cites conflicting evidence favorable to him and emphasizes the absence of eyewitnesses.  However, as our Supreme Court has repeatedly articulated, the applicable standard of review is as follows:  "'[W]e review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt.  [Citation.]  The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant

7

guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]" [Citation.] A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict. [Citation.]' ([Citation], italics omitted. . . .)" (*People v. Manibusan* (2013) 58 Cal.4th 40, 87; accord, *People v. Banks* (2014) 59 Cal.4th 1113, 1156.) The standard of review is the same in cases where the prosecution relies primarily on circumstantial evidence. (*People v. Hajek* (2014) 58 Cal.4th 1144, 1183; *People v. Manibusan, supra,* 58 Cal.4th at p. 87.) Moreover, as our Supreme Court has explained: "'We "must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]" [Citation.] "Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]" [Citation.] Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal. [Citation.]' [Citation.]" (*People v. Manibusan, supra,* 58 Cal.4th at p. 87; accord, *People v. Brady* (2010) 50 Cal.4th 547, 561.)

## 2. Burglary

Defendant asserts there was insufficient evidence he committed a burglary. Pursuant to section 459, "Every person who enters any house . . . with intent to commit . . . grand or petit larceny or any felony is guilty of burglary." The jury was instructed in part: "Every person who enters any building with the specific intent to steal, take, and carry away the personal property of another of any value and with the further specific intent to deprive the owner permanently of that property, or with the specific intent to commit theft of services . . . is guilty of the crime of burglary . . . ."

Defendant argues there was insufficient evidence he entered the house with the specific intent to deprive the owner of property or to steal utility services. We disagree. Viewed in the light most favorable to the verdict, the evidence established defendant's guilt of burglary. Defendant had no key to the house, no contact information for the lessor, no receipt for rent paid and no legitimate lease. There had been no utility service to the unoccupied property for some time before defendant moved in. And the utility services were stolen after defendant took up residence. Defendant further asserts there was no evidence he "broke into" the property. However, there is no requirement of breaking or use of force; entry alone is sufficient. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1060; *People v. Davis* (1998) 18 Cal.4th 712, 720-721.)

## 3. Theft of services

Defendant challenges the sufficiency of the evidence to support his theft of services conviction. The crime of theft of services is codified in section 498 which provides in part: "(b) Any person who, with intent to obtain for himself or herself utility services [including electricity, gas and water] without paying the full lawful charge therefor, or with intent to enable another person to do so, or with intent to deprive any utility of any part of the full lawful charge for utility services it provides, commits, authorizes, solicits, aids, or abets any of the following shall be guilty of a misdemeanor.

9

[¶] (1) Diverts or causes to be diverted utility services, by any means. [¶] (2) Prevents any utility meter, or other device used in determining the charge for utility services, from accurately performing its measuring function by tampering or by any other means. [¶] (3) Tampers with any property owned by or used by the utility to provide utility services. (4) Makes or causes to be made any connection with or reconnection with property owned or used by the utility to provide utility services without the authorization or consent of the utility. [¶] (5) Uses or receives the direct benefit of all or a portion of utility services with knowledge or reason to believe that the diversion, tampering, or unauthorized connection existed at the time of that use, or that the use or receipt was otherwise without the authorization or consent of the utility." (See *McAfee v. Los Angeles Gas & Elec. Corp.* (1932) 215 Cal. 219, 225 ["The essence of the offense is the use of gas by any contrivance and under circumstances denounced by the statute in such manner as to supply such gas 'without passing through any meter provided for the measuring and registering the quantity of gas' so used"].)

A permissive inference that a defendant intended to and did violate section 498 arises under the following circumstances: "[T]he presence of any of the following objects, circumstances, or conditions on premises controlled by the [defendant] or by the person using or receiving the direct benefit of all or a portion of utility services obtained in violation of this section . . . : [¶] (1) Any instrument, apparatus, or device primarily designed to be used to obtain utility services without paying the full lawful charge therefor. [¶] (2) Any meter that has been altered, tampered with, or bypassed so as to cause no measurement or inaccurate measurement of utility services." (§ 498, subd (c).) The jury was instructed in terms consistent with section 498.

Defendant asserts there was no evidence he tampered with the utilities or had knowledge that someone else had done so. We disagree. Viewed in the light most favorable to the judgment, defendant moved into an empty house with no gas, water or electric service. Defendant was an auto mechanic and a self-described handyman. He made repairs around the home. It can be inferred defendant, or others with his knowledge, illegally acquired the utilities shortly after he moved in. As noted above,

10

defendant moved in on June 17 and was arrested on October 21, 2013. The electricity had been illegally in use between approximately June 21 and October 21, 2013. Water service had been illegally acquired after July 2, 2013. Moreover, the water service was turned off on September 5 and illegally resumed sometime before September 23, 2013. Defendant testified he assumed Mr. Brown was paying for those utilities. But there was no corroborating evidence Mr. Brown even existed. There was no corroborating evidence ever produced that Mr. Brown had rented the home to defendant and agreed to pay the utilities. Moreover, defendant admitted not speaking to Mr. Brown for months. Also, defendant had no contact information for Mr. Brown. Finally, defendant had not paid any rent to Mr. Brown in months.

Defendant further asserts there was insufficient evidence the value of the stolen utility services totaled more than $950. We disagree. Under section 498, subdivision (d), when the value of that stolen exceeds $950, the crime is punishable as a misdemeanor or as a felony. Here, the stolen electricity was valued at $976.76. The stolen water was valued at $17. There was no evidence as to the value of the stolen gas. Nevertheless, there was substantial evidence the value of the stolen utilities exceeded $950.

Defendant claims there was insufficient evidence the electricity value should have been determined at a rate of 31 cents per kilowatt rather than 29 cents per kilowatt. That argument is without merit. As noted above, Mr. Kumar estimated the electricity had been illegally in use between June 21, 2012, four days after defendant began residing in the home, and October 21, 2013. Defendant was arrested on October 21, 2013. Electricity was charged at the 31-cents-per-kilowatt rate from May 31 through October 31 of each year. This was substantial evidence the electricity value was properly determined at a rate of 31 cents per kilowatt.

## 4. Forgery

Defendant argues there was no substantial evidence of forgery. Pursuant to section 470, subdivision (d), "Every person who, with the intent to defraud, falsely

11

makes, alters, forges, or counterfeits, utters, publishes, passes or attempts or offers to pass, as true and genuine, any of the following items, knowing the same to be false, altered, forged, or counterfeited, is guilty of forgery: any . . . lease . . . ." (See *People v. Driggs* (1910) 14 Cal.App. 507, 509-510 [evidence sufficient to sustain forgery conviction where forged lease was recorded].) The jury was instructed: "Defendant is accused in Count 3 of having violated section 470, subdivision (d) of the Penal Code, a crime. [¶] Every person who, with the specific intent to defraud, falsely makes, alters, forges, or counterfeits, any contract is guilty of the crime of forgery . . . . [¶] In order to prove this crime, each of the following elements must be proved: [¶] 1. A person falsely made, altered, forged or counterfeited any contract; [¶] 2. That person acted with the specific intent to defraud another person. [¶] The existence of a specific intent to defraud is an essential element of the crime of forgery, but it is not necessary to complete the crime that any person be actually defrauded or suffer a loss by reason of the forgery." Here, when confronted by Detective Moser, defendant offered as true a falsely executed lease. The jury could reasonably conclude defendant did so to defraud Detective Moser. The purported lease contained information inconsistent with defendant's claims and his subsequent testimony. It included the names of individuals defendant did not know. It was internally inconsistent. It made no sense. Moreover, there was testimony defendant admitted to Detective Moser that the lease was fraudulent. This constituted substantial evidence of forgery.

B. Defendant's Motion To Reduce His Crimes To Misdemeanors

The trial court denied defendant's motion to reduce his adjudicated felonies to misdemeanors under section 17, subdivision (b). The trial court had the discretion to do so notwithstanding defendant's prior felony conviction within the meaning of sections 667, subdivisions (b) through (i) and 1170.12. (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 972-973; cf. *Robert L. v. Superior Court* (2003) 30 Cal.4th 894,

12

914.) In ruling on a section 17, subdivision (b) motion, the trial court must consider all relevant factors including: the nature and circumstances of the accused's present offense; the defendant's criminal history; "the defendant's appreciation of and attitude toward the offense"; the defendant's rehabilitation potential; the community's need for protection; and the defendant's "traits of character as evidenced" during the trial. (*People v. Superior Court* (*Alvarez*)*, supra,* 14 Cal.4th at p. 978; see *People v. Park* (2013) 56 Cal.4th 782, 801; *People v. Garcia* (1999) 20 Cal.4th 490, 501-502.) On appeal, we apply the "extremely deferential and restrained" abuse of discretion standard of review. (*People v. Superior Court* (*Alvarez*)*, supra,* 14 Cal.4th at p. 981; see *id.* at pp. 977-978; *People v. Trausch* (1995) 36 Cal.App.4th 1239, 1247.) Two additional precepts are also in play: "'The burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.' [Citation.] Concomitantly, '[a] decision will not be reversed merely because reasonable people might disagree. "An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge." [Citations.]' [Citation.]" (*People v. Superior Court* (*Alvarez*)*, supra,* 14 Cal.4th at pp. 977-978; cf. *People v. Carmony* (2004) 33 Cal.4th 367, 376-377 [§ 1385].)

There was no abuse of discretion. Defendant had a long criminal history dating from 1991. He had multiple convictions for deadly weapon assault, among other crimes. He had served a state prison sentence for deadly weapon assault, a serious felony. (§ 1192.7, subd. (c)(31).) He had also performed poorly on probation.

On August 3, 1991, defendant was convicted in Jackson County, Missouri of deadly weapon assault. Defendant admitted having sustained this conviction at trial. There is no record of the sentence imposed. Defendant's subsequent crimes were committed in Los Angeles County. On July 7, 1993, defendant was convicted of misdemeanor deadly weapon assault. He was placed on three years' summary probation. On November 28, 1995, defendant was convicted of misdemeanor controlled substance

13

paraphernalia possession. He was sentenced to 10 days in the county jail. On March 5, 1996, defendant was convicted of felony deadly weapon assault. He was placed on four years' formal probation. His probation was twice revoked. On February 26, 2001, he was sentenced to nine years in state prison. He was later paroled. On May 30, 1997, defendant was convicted of misdemeanor driving with a suspended license. He was sentenced to two days in the county jail.

On May 31, 2000, defendant was convicted of misdemeanor battery on a spouse or cohabitant. He was placed on three years' summary probation. On November 28, 2012, following his release from prison for deadly weapon assault, defendant was convicted of an infraction, failure to appear. On December 6, 2012, defendant was convicted of driving with a suspended license, a misdemeanor. He received three years' summary probation. His probation terminated on October 23, 2013. And on August 15, 2013, defendant was again convicted of misdemeanor driving with a suspended license. He was placed on five years' summary probation. On October 23, 2013, as a result of his arrest in the present case, defendant's probation was revoked. The probation department's pre-conviction report states that prior to his arrest, defendant was an unemployed transient. As noted above, defendant was on probation when he committed the present crimes. The probation department considered defendant a serious threat "to the community." It recommended a state prison sentence. During the present trial, defendant had exhibited anger and a lack of self-control. He talked back to the prosecutor and the trial court. The trial court had to repeatedly admonish defendant to control his emotions and simply to answer the questions posed. The trial court described defendant's attitude on the stand as "hostile." The trial court impliedly took all of the foregoing into account in denying defendant's motion for reduction to misdemeanors. There was no abuse of discretion.

## C. Defendant's Peace Officer Personnel Records Motion

Defendant filed a pretrial motion for disclosure of information contained in Detective Moser's peace officer personnel records. The motion sought records of any accusations Detective Moser had used excessive force, exhibited bias, fabricated evidence or was dishonest among other things. (See *Pitchess v. Superior Court* (1974) 11 Cal.3d 531, 534-540; Evid. Code, §§ 1043-1047; §§ 832.5, 832.7.) In her declaration in support of the motion, defense counsel, Dana H. Plummer, alleged Detective Moser included false statements of fact in his incident report. The trial court ordered that an in camera review of Detective Moser's peace officer personnel records be conducted for evidence of acts of dishonesty. Defendant does not challenge the trial court's partial denial of his motion in other respects. The trial court conducted an in camera hearing. The trial court reviewed the documents and found one should be disclosed to defendant. Defendant has requested that we independently review the sealed transcript of the December 19, 2013 in camera hearing to determine if other documents should have been disclosed. We have conducted that review. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1228-1232.) The record is adequate for appellate review. (*People v. Myles* (2012) 53 Cal.4th 1181, 1209; *People v. Mooc, supra,* 26 Cal.4th at p. 1229; compare *People v. Wycoff* (2008) 164 Cal.App.4th 410, 415; *People v. Guevara* (2007) 148 Cal.App.4th 62, 68-69.) The trial court did not abuse its discretion in determining only one document was discoverable. (*People v. Myles, supra,* 53 Cal.4th at p. 1209; *People v. Hughes* (2002) 27 Cal.4th 287, 330; *People v. Mooc, supra,* 26 Cal.4th at pp. 1228, 1232.)

## D. Abstract Of Judgment

The trial court imposed a $10 local crime prevention programs fine (§ 1202.5, subd. (a)) "plus penalty assessment." The abstract of judgment includes the following order, "Pay $29 penalty assessment." We asked the parties to brief the question whether the penalties totaled $31 rather than $29 dollars. The local crime prevention programs

15

fine was subject to the following penalties and a surcharge totaling $31:  a $10 state penalty (§ 1464, subd. (a)(1)); a $2 state surcharge (§ 1465.7, subd. (a)); a $5 state court construction penalty (Gov. Code, § 70372, subd. (a)(1)); a $7 county penalty (Gov. Code, § 76000, subd. (a)(1)); a $1 deoxyribonucleic acid penalty (Gov. Code, § 76104.6, subd. (a)(1)); a $4 state-only deoxyribonucleic acid penalty (Gov. Code, § 76104.7, subd. (a)); and a $2 emergency medical services penalty (former Gov. Code, § 76000.5, subd. (a)(1), as amended by Stats. 2010, ch. 328, § 102, eff. Jan. 1, 2011-Dec. 31, 2013).  The abstract of judgment must be amended to so provide.  (See *People v. Rader* (2014) 228 Cal.App.4th 184, 201; *People v. Valencia* (2014) 226 Cal.App.4th 326, 330.)

## IV. DISPOSITION

The judgment is affirmed. Upon remittitur issuance, the clerk of the superior court is to amend the abstract of judgment to reflect $31 in penalties and a surcharge on the Penal Code section 1202.5, subdivision (a) local crime prevention programs fee, specifically: a $10 state penalty (Pen. Code, § 1464, subd. (a)(1)); a $2 state surcharge (Pen. Code, § 1465.7, subd. (a)); a $5 state court construction penalty (Gov. Code, § 70372, subd. (a)(1)); a $7 county penalty (Gov. Code, § 76000, subd. (a)(1)); a $1 deoxyribonucleic acid penalty (Gov. Code, § 76104.6, subd. (a)(1)); a $4 state-only deoxyribonucleic acid penalty (Gov. Code, § 76104.7, subd. (a)); and a $2 emergency medical services penalty (former Gov. Code, § 76000.5, subd. (a)(1)). The clerk of the superior court is to deliver a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


TURNER, P.J.


We concur:



MOSK, J.




GOODMAN, J.*

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17